**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 1:24-cv-25076**

MAINSAIL PARENT, LLC
d/b/a ASPIRION, a Delaware limited
liability company, and
SPECIALIZED HEALTHCARE
PARTNERS, LLC, a Florida limited
liability company,

       Plaintiffs,

v.

DEVANNIE ABELL, an individual.

       Defendant.

_____/

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs, Specialized Healthcare Partners, LLC and Mainsail Parent, LLC d/b/a Aspirion (collectively "Plaintiffs," "Aspirion," or "Company") bring suit against Defendant Devannie Abell ("Defendant Abell") and allege as follows:

**NATURE OF THE ACTION**

1.    This case of unfair competition arises between two revenue cycle management ("RCM") companies and involves a disloyal former employee who actively stole Aspirion's trade secrets and proprietary information in connection with a larger, illegal scheme to divert clients and employees from Aspirion to a new competing company, Ternium, LLC ("Ternium"). This former employee was recruited by four other former employees—David Jewell, Michael Cameron, Alisha Mays, and Megan Kelly (collectively, the "Former Employee Co-Conspirators")—to steal Aspirion's trade secrets and other confidential business information to recreate Aspirion's

1

proprietary data systems at Ternium. The Former Employee Co-Conspirators specifically recruited Aspirion's Senior Business Intelligence Administrator—Defendant Abell—to accomplish their plan. Defendant Abell worked for Ternium for nearly a year while secretly and simultaneously employed by and managing Aspirion's most sensitive proprietary and confidential information in the Company's data engineering division. An ensuing investigation by Aspirion revealed that during this time frame, Defendant Abell stole the Company's proprietary and confidential information while acting in concert with the Former Employee Co-Conspirators.

2.     In July 2024, Aspirion uncovered damning information revealing that the Former Employee Co-Conspirators have been covertly siphoning Aspirion's business for years—both before and after the Former Employee Co-Conspirators tendered their resignations to the Company. Defendant Abell and the Former Employee Co-Conspirator's blatant misconduct is actively eroding Aspirion's business, causing the Company significant harm.

3.     Plaintiffs filed an initial complaint against the Former Employee Co-Conspirators and Ternium on July 29, 2024. *Mainsail Parent, LLC et al. v. Jewell et al.*, 1:24-cv-22875-CMA, ("*First Case*"), (D.E. 1). Plaintiffs concurrently filed a motion for temporary restraining order and preliminary injunction. *First Case*, (D.E. 6).

4.     After issuing the temporary restraining order requested by Plaintiffs, the Court held a four-day evidentiary hearing on Aspirion's Motion for Preliminary Injunction on August 7, 12, 13, and 16, 2024. Over the course of the hearing, the parties presented evidence and heard testimony from seven witnesses. On August 26, 2024, the court in *First Case* enjoined Former Employee Co-Conspirators David Jewell and Michael Cameron from soliciting or serving Aspirion clients or soliciting or hiring current or former Aspirion employees. *First Case*, (D.E. 60).

5.      Months after filing the original complaint on July 29, 2024, Aspirion learned through discovery in *First Case* that the Former Employee Co-Conspirators had retained Abell while she still was working with Aspirion, prompting the investigation that revealed Abell's theft of the Company's trade secrets and confidential business information.

6.      Defendant Abell's misappropriation of Aspirion's trade secrets and confidential information enabled and aided the Former Employee Co-Conspirators in the scheme to solicit and steal Aspirion clients and employees. Because of this ongoing misconduct, Plaintiffs have suffered and continue to suffer damages.

7.      In *First Case*, Plaintiffs moved to amend their complaint to add Abell as a defendant. On December 3, 2024, the court in *First Case* denied that motion, but in its order stated "[n]othing in this Order prevents Plaintiffs from pursuing claims against Devannie Abell in a separate action." *First Case*, (D.E. 85). Plaintiffs now file this instant action. At the same time, Plaintiffs are moving that this case be consolidated for all purposes with *First Case* for litigation on the existing *First Case* case schedule.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiffs' claims brought pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)-(c), and 28 U.S.C. § 1331.

9.      This Court has pendant jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

10.     Subject matter jurisdiction also exists by virtue of diversity of citizenship, 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of seventy-five thousand

dollars ($75,000), exclusive of attorneys' fees, interest and costs, and there is complete diversity of citizenship.

11.     Plaintiff Specialized Healthcare Partners, LLC is a limited liability company organized and existing under the laws of the state of Florida, with its principal place of business located in Del Ray Beach, Palm Beach County, Florida. Specialized Healthcare Partners, LLC's lone member is a citizen of the state of Delaware. Specialized Healthcare Partners, LLC is in the business of providing RCM services and operates under the Aspirion brand as a wholly owned subsidiary of Mainsail Parent, LLC d/b/a Aspirion Health Resources ("Aspirion"). As further explained in the following paragraph, Aspirion is a citizen of Delaware.

12.     Plaintiff Mainsail Parent, LLC d/b/a Aspirion Health Resources ("Aspirion") is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business located in Columbus, Georgia. Mainsail Parent, LLC's lone member, Mainsail Midco, LLC, is a citizen of the state of Delaware. Mainsail Midco, LLC's sole member is Mainsail Holdco LLC. Mainsail Holdco's sole members are four Delaware corporations with their principal place of business in Wilmington, Delaware. Thus, for purposes of diversity of citizenship, Aspirion is a citizen of Delaware.

13.     Defendant Abell was employed as a Senior Business Intelligence Administrator in the Data Engineering division at the Company from June 2014 until November 1, 2024. Upon information and belief, Abell is currently a resident of the state of Florida.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because (a) Defendant resides in the Southern District of Florida, (b) Defendant conducts business in this District, and (c) a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### A.  The RCM Industry

15.    RCM vendors, such as Aspirion, focus on supporting hospitals and healthcare systems (also referred to as "healthcare providers") by providing services to more efficiently manage the healthcare provider's revenue cycles.

16.    The revenue cycle in healthcare is inherently complex. The fee healthcare providers are paid for a medical service is often a fraction of the fee billed for that service. The fee paid to a healthcare provider varies based on the type of medical care provided; medical necessity; provider and facility credentialing; the patient's medical insurance coverage; the terms of the healthcare provider's contract with a medical insurance company; laws and regulations governing potential payers; and compliance with medical coding, billing, documentation, and submission standards. The complexity of the healthcare revenue cycle, the limited access to skilled staff, and the subject matter expertise required to maximize collections lead the majority of hospitals and health systems to partner with RCM vendors to help optimize reimbursements, identify and correct billing errors, pursue complex claims, assist with overturning denials, and collect fairly owed accounts receivables.

17.    The goal for RCM companies is to provide services that maximize healthcare provider revenue while decreasing the time spent on administrative and clinical functions and accelerating the time to payment. This, in turn, supports the financial viability of healthcare providers and allows healthcare providers to devote more resources to patient care and treatment.

### B.  Aspirion

18.    Aspirion is a technology-enabled RCM vendor that supports hospitals and healthcare systems. Aspirion has over 170 clients nationwide. For over two decades, Aspirion has

helped healthcare providers manage and improve their claims processing, payment, collection, and revenue generation functions and processes.

19.     Aspirion invests significant resources to develop and maintain goodwill with its customers and clients, workforce, and referral services. The Company's assembled workforce, in which it invests substantial time, money and resources, is comprised of more than 1,400 employees, including more than 170 attorneys and legal staff, over 60 clinicians, nine (9) sales representatives, and a team of other healthcare professionals. These roles vary from non-management level employees to executive level employees.

20.     Aspirion's service offerings are highly specialized and distinct from most other healthcare RCM vendors. Aspirion's core and most profitable line of business is Denials Management, with special emphasis on high-balance clinical denials. This type of work requires specialized expertise and training. As a qualification for their roles, three of the four Former Employee Co-Conspirators—Jewell, Kelly, and Mays—held juris doctorate degrees (J.D.s) and were trained by the Company to become subject matter experts regarding denied medical insurance claims. This type of work also involves the specialized use of advanced data processing systems to effectively service large healthcare systems. Aspirion invests heavily in developing and creating efficient data processing systems to efficiently extract, manipulate, and map client data to perform denials work. These areas of expertise are not only core to Aspirion's performance outcomes but serve as key differentiators in the healthcare revenue cycle marketplace.

**C.  Defendant Abell and Her Co-Conspirators**

**Defendant Devannie Abell**

21.     Defendant Abell held the title of Senior Business Intelligence Administrator on the data team at Aspirion. In her role, Abell was responsible for configuring highly sensitive business information into standardized, operable data, in addition to supporting Aspirion with proprietary

reporting and analysis. This meant that she accessed Plaintiffs' most sensitive proprietary and confidential information on a daily basis.

22.     In fact, Defendant Abell was tasked with preparing and maintaining the Company's "Priority Report," which is Aspirion's proprietary repository of historical operational data providing Plaintiffs' complete performance history on a client-by-client basis.

23.     Plaintiffs uncovered through an internal investigation that Defendant Abell was covertly working for both Ternium and Aspirion for nearly a year. The Former Employee Co-Conspirators and Ternium first solicited Defendant Abell on September 22, 2023, and gave her an offer on October 10, 2023. Defendant Abell purportedly worked for Ternium as an independent contractor from October 13, 2023 to August 26, 2024. During this time, she continued to be employed at Aspirion.

24.     Defendant Abell's employment ended at Aspirion on November 1, 2024. She had worked for Aspirion for ten years.

25.     On that same day, she was re-hired as an employee at Ternium.

**Former Employee Co-Conspirators**

**David Jewell**

26.     David Jewell was formerly employed by Specialized Healthcare Partners, LLC. Following Aspirion's acquisition of Specialized Healthcare Partners, LLC in July 2019, Jewell retained the role of Managing Attorney and was subsequently promoted to Managing Attorney & Executive Director of Client Success within the Company's Client Success Department ("Executive Director").

27.     In his role as Executive Director, Jewell oversaw approximately 25% of the Company's clients and was responsible for leading the team of legal and business professionals

directly supporting those clients. Jewell was also tasked with business development and asked to identify opportunities for expansion and to cross-sell within his client base.

28.     Jewell was assigned to and served as the primary client-facing contact for approximately 25% of the Company's clients. As Executive Director, he was responsible for client satisfaction, client retention, and client expansion. He was also responsible for ensuring the operations team's performance met the client's needs. In sum, Jewell had intimate knowledge of and was entrusted with cultivating and managing Aspirion's relationships with his assigned clients.

29.     In March 2018, David Jewell entered into an employment agreement with Aspirion, containing non-solicit provisions prohibiting him from soliciting Aspirion employees and soliciting and servicing Aspirion clients.

30.     Effective September 27, 2023, Jewell resigned from his position with the Company.

31.     Jewell is a founder, co-owner, and member of Ternium. He serves as Ternium's Managing Partner and Chief Executive Officer.

### **Michael Cameron**

32.     Michael Cameron was the former Chief Client Officer of the Company prior to Aspirion's acquisition of Specialized Healthcare Partners, LLC in July 2019. Following the acquisition, Cameron held the position of Senior Vice President of Sales at the Company.

33.     As Senior Vice President of Sales, Cameron was responsible for establishing relationships with Aspirion's prospective clients as well as expanding Aspirion's business relationship with specific current clients. In total, he had accountability for sales and business development with approximately 90 healthcare entities.

34.     On July 20, 2016, Michael Cameron entered into an employment agreement with Aspirion, containing non-solicit provisions prohibiting him from soliciting Aspirion employees and soliciting and servicing Aspirion clients.

35.     Effective January 31, 2024, Cameron resigned from his position with the Company.

36.     Cameron is a founder, co-owner, and member of Ternium. He serves as Ternium's Chief Revenue Cycle Officer.

**<u>Alisha Mays and Megan Kelly</u>**

37.     Both Mays and Kelly held the title of Managing Attorney & Executive Director of Client Success and, therefore, had the same or similar responsibilities as Jewell.

38.     Prior to Mays's resignation from Aspirion in October 2023, she was the Managing Attorney & Executive Director at the Company who was responsible for 25% of client accounts. Likewise, Kelly was entrusted with and responsible for leading Aspirion's relationship with another 25% of the Company's clients.

39.     Kelly resigned from Aspirion on October 13, 2023, which was just three weeks after Jewell left the company.

40.     Mays resigned from Aspirion on October 20, 2023, which was one week after Kelly resigned.

41.     Kelly and Mays are founders, co-owners, and members of Ternium. Kelly serves as Ternium's Chief Client Officer and Security Officer. Mays serves as Ternium's Chief Operating Officer.

**D.  Aspirion's Policies Protecting Its Confidential Information**

42.     Given their respective roles, Defendant Abell and all four Former Employee Co-Conspirators were intimately familiar with the Company's marketing strategies, confidential pricing information, and business development plans. Defendant Abell and the Former Employee

Co-Conspirators also had knowledge of and access to Aspirion's Confidential Information, which encompasses, among other things, its most sensitive trade-secret, confidential, competitively-sensitive, proprietary, and commercially valuable business information, including the Company's business accounts, financial information for every client, operational structure, proprietary algorithms, processes and methodologies, compensation plans, operational processes, workforce training materials, prospective and existing customers, vendor lists, personnel information, marketing and sales techniques, systems, reports, client specific analytics and performance history, data processing models, software code, and business plans, among other confidential business information ("Confidential Information"). Aspirion's Confidential Information gives the Company competitive advantages over its competitors.

43.     In her role as Senior Business Intelligence Administrator at the Company, Defendant Abell not only had access but was tasked with running Aspirion's complete operational history for every high balance clinical denials client dating back 12 years. This essential file, referred to as the "Priority Report," is a large repository of historical operational data providing Plaintiffs' complete performance history on a client-by-client basis. It contains commercially valuable and competitively sensitive data, including Aspirion's historical success, yield, and collection rates, historical time to payment, and client history, among other data. The repository contains historical data on every discrete denial type (with categories and indicators), which is used frequently to produce internal reports containing trend analytics based on inventory history and outcomes. This information is critical for Aspirion when pitching current and prospective clients. For example, Aspirion uses the analysis to craft specific contract proposal terms. The information is also used to pitch clients by identifying areas of potential strength and weakness in their denials recovery. Such data would also be highly valuable to a competitor because it could

be used to predict project needs, time until resolution, and recovery rates for prospective clients. This information derives independent material economic benefit because competitors could use this information to unfairly and directly compete with Aspirion in contract negotiations or bid processes by identifying and targeting Aspirion's most valuable clients based on their historical utilization rates and by tailoring pricing structures and other contract terms based on the benefit of Aspirion's existing practices.

44.     Defendants Abell and the Former Employee Co-Conspirators each had access to and frequently used Compass, which is a workflow platform that is proprietary to Aspirion and houses Aspirion's standardized client files for data extraction, ingestion, and mapping. Defendant Abell, as a member of the Company's data team, also frequently used EasyMorph, which is a commercially-licensed tool. Aspirion has created company-specific proprietary algorithms, data translations, and custom data extracts for EasyMorph to transform clients' raw data files into standardized data to produce client reports utilized by Aspirion. The reports are subsequently transferred into Compass. Defendant Abell had the ability and know-how to access the respective proprietary codes and data processing models that provide the foundation for Compass and Aspirion's use of the EasyMorph platform. Moreover, Defendant Abell and all four Former Employee Co-Conspirators had access to some of the Company's most secret and competitively sensitive information—including prospective customer lists and intelligence about evolving and pending sales opportunities. Aspirion's prospective customers are compiled in a cloud-based platform: SalesForce. The platform does not only include a list of the Company's identified prospects, but also identifies key decision-makers at each prospect, and contains notes on each opportunity, information related to negotiation and pricing strategies, and data on prospective client needs, preferences, and buying behaviors. The Company has dedicated and continues to

dedicate significant investment (both time and money), research, business intellect, client relationships and data collection efforts to compile the data captured in SalesForce. The information contained in Aspirion's SalesForce platform, compiled over the course of two decades, gives the Company a competitive advantage over its competitors.

45.     In addition to intelligence about prospective clients, Aspirion also compiles and stores competitively sensitive information about its existing customers in SalesForce. For example, Aspirion creates and stores client-specific Strategic Account Plans for existing clients, which include customers' forecasted needs, Aspirion's perceived performance vulnerabilities, customers' contracts and pricing structure, customers' past and forecasted rates of utilization, and Aspirion's strategic opportunities at its customers. The SalesForce database also contains a client-specific "risk score," which reveals the perceived strengths and weaknesses of a client relationship. Such information would be highly valuable in the hands of a competitor since the information could be used by a competitor to (1) identify and specifically target Aspirion clients and prospective clients to pursue based on the client's forecasted needs or perceived vulnerabilities in the client relationship, and (2) tailor service offerings and pricing terms to address those needs (while undercutting Aspirion's pricing terms).

46.     The Company maintains robust policies and procedures to ensure employees protect its Confidential Information. As a condition of their continued employment with Aspirion, Defendant Abell and each of the Former Employee Co-Conspirators annually reviewed and agreed to abide by the "Aspirion Acceptable Use Policy." The purpose of the Acceptable Use Policy "is to outline the acceptable use of Aspirion data, devices and equipment, Aspirion's information systems and Aspirion's client's information system." The Acceptable Use Policy, at the outset, requires that "users maintain confidentiality indefinitely, even after the contract, work,

employment, or any other aspect of involvement with Aspirion has ended." A true and correct copy of the Acceptable Use Policy is attached hereto as **Exhibit A**.

47.     The Acceptable Use Policy contains the following three prohibitions concerning Plaintiff's Confidential Information:

- Employees will not disclose confidential information, such as internal policies, business correspondence, company announcements, without authorization and will not use confidential information to compromise the organization in any way.

- Employees should not save or store confidential information in unsecure areas on their computer such as in the "downloads" folder or on the user's desktop and should empty the computer's "trash" regularly.

- Employees must not disclose confidential information to non–employees, family members or organization outsiders without authorization from Aspirion Management.

Ex. A, Acceptable Use Policy, Sec. XI(a)(i) (1), (3)-(4).

48.     The Acceptable Use Policy also expressly provides that "[e]mployees' duty to protect confidential information will survive termination of employment and remain in effect until such information becomes public knowledge, or until Aspirion provides written notice releasing employee from the obligations set forth in this policy, whichever occurs first." *Id*. Sec. XI(a)(i)(2).

49.     Defendant Abell expressly acknowledged that she understood and would comply with the required "Aspirion Acceptable Use Policy." *See* **Exhibit B**, Acceptable Use Policy and Training Acknowledgement Form for D. Abell.

50.     Aspirion's Code of Conduct within the Aspirion Teammate Handbook further underscores the Company's commitment to protecting its Confidential Information. The Handbook specifically lists "[g]ross misconduct, such as fraud or forgery, or violation of confidentiality" as a violation of Company policy, punishable by termination.

**E. Aspirion Discovers Ternium and the Former Employee Co-Conspirators' Misconduct.**

51.     Beginning in May 2024 and continuing into the summer of 2024, Aspirion learned that several of its former employees, including the Former Employee Co-Conspirators, were working with a new RCM company, Ternium.

52.     This discovery prompted the Company to undertake an internal IT investigation to determine the extent of Ternium's involvement with the Company's employees and clients.

53.     Aspirion was shocked by the information that resulted from the investigation.

54.      Upon uncovering this information, Plaintiffs filed an initial complaint against the Former Employee Co-Conspirators and Ternium on July 29, 2024. *First Case*, (D.E. 1). Plaintiffs concurrently filed a motion for temporary restraining order and preliminary injunction. *First Case*, (D.E. 6).

55.     After issuing the temporary restraining order requested by Plaintiffs, the Court held a four-day evidentiary hearing on Aspirion's Motion for Preliminary Injunction on August 7, 12, 13, and 16, 2024. Over the course of the hearing, the parties presented evidence and heard testimony from seven witnesses.

56.     Both the hearing testimony and discovery in *First Case* confirmed the allegations in Plaintiffs' original complaint and revealed additional misconduct far beyond the information that Aspirion's internal IT investigation uncovered, namely Defendant Abell's misappropriation and theft of Aspirion confidential information.

**F. Defendant Abell is in Possession of Aspirion's Confidential and Proprietary Information.**

57.     As alleged *supra*, the Former Employee Co-Conspirator's illegal scheme included the hiring of Aspirion's ten-year data analyst, Defendant Abell, who covertly worked at Aspirion for nearly a year beginning in October 2023.

58.     Upon information and belief, the Former Employee Co-Conspirators targeted Defendant Abell, who was employed by Aspirion for ten years, because of her knowledge and access to Aspirion's confidential data processing procedures. Defendant Abell began working for Ternium on October 13, 2023, and, unbeknownst to the Company, continued to work simultaneously for Aspirion and Ternium for more than ten months.

59.     Defendant Abell is currently the Management Information Systems Director at Ternium and has the responsibility of processing and assisting with placement and transaction files, which is the same role Defendant Abell performed at Aspirion.

60.     Upon information and belief, from October 13, 2023, through August 26, 2024, the Former Employee Co-Conspirators and Ternium were aware that Defendant Abell was simultaneously and secretly working for both Aspirion and Ternium.

61.     Prompted by the Former Employee Co-Conspirator's admission that Defendant Abell was hired and worked at Ternium while she was simultaneously working at Aspirion, the Company immediately expanded its ongoing forensic IT efforts to investigate whether and to what extent Abell had a role in the Former Employee Co-Conspirators' unlawful scheme.

62.     The investigation revealed that Defendant Abell, while employed at Aspirion and simultaneously working for Ternium, stole Aspirion's confidential and proprietary information.

**G.  Defendant Abell Steals Aspirion's Proprietary Platform and Data Models**

63.     Upon information and belief, Defendant Abell was enlisted by the four Former Employee Co-Conspirators to unlawfully aid in the formation and operation of Ternium.

64.     Upon information and belief, the Former Employee Co-Conspirators enlisted Defendant Abell's data expertise to help them set up Ternium's infrastructure by stealing Aspirion-developed data models and systems and using this information to replicate, for Ternium, the Company's business model and data methodologies.

65.     Upon information and belief, these files containing proprietary code and other Aspirion data models were stolen by Defendant Abell to act as the "blueprint" for Ternium, enabling the Former Employee Co-Conspirators to fast-track an otherwise lengthy process of data manipulation and begin servicing clients using Aspirion-built data processing models.

66.     On October 9, 2023, a few weeks after Ternium first contacted Defendant Abell and the day before she was offered work at the Former Employee Co-Conspirator's company, Defendant Abell stole a systems-related "map" used by Aspirion for reporting purposes. Process mapping is a technique that Aspirion uses to create and visually map out a workflow to track the build-out of placement files for reporting. Defendant Abell emailed the Excel file from her Aspirion email account to her personal Gmail account.

67.     Upon information and belief, Defendant Abell stole this map to set up a data structure at Ternium that facilitates reporting by using the same mapping and procedures that Aspirion uses.

68.     On November 18, 2023, Defendant Abell stole three models Aspirion created for use in EasyMorph that automate placements for Aspirion's Piedmont, Conifer, and Cedars Sinai clients. These models are specific to how Aspirion exchanges data with these three clients—all clients that the Former Employee Co-Conspirators had close ties to while working for Aspirion. These data models are Aspirion's proprietary processes for how the Company maps a client's system and feeds data into the Company's data model. Defendant Abell emailed these models from her Aspirion account to her personal Gmail account one month after she began work at Ternium.

69.     Upon information and belief, the Former Employee Co-Conspirators recruited Defendant Abell to take these Aspirion-built models and to rebuild placement files for these clients under a different EasyMorph license for operation by Ternium.

70.     On April 10, 2024, Defendant Abell emailed to her personal email account an EasyMorph model that Plaintiffs believe includes a call-out to a third-party application, Kleopatra, to request a decryption key providing access to Aspirion's client placement files. Aspirion's IT inspection confirmed that the decryption keys are privately shared with Aspirion by clients.

71.     On April 22, 2024, Defendant Abell emailed four files containing additional Aspirion denials-related models for EasyMorph, including the model for the Priority Report, to her personal email account. The Priority Report is a critical report used by select managers and executives at Aspirion to manage RCM denial services. The Priority Report contains detailed and complete operational data for Aspirion's entire high balance clinical denials history, broken down by client. By stealing the model Aspirion uses to develop the Priority Report, Defendant Abell can recreate her version of the Aspirion Priority Report at Ternium.

72.     On April 23, 2024, Defendant Abell emailed EasyMorph software-related updates to her personal email account.

73.     On June 12, 2024, Defendant Abell emailed to her personal email account a screenshot of the formula and code Aspirion uses to create their Priority Report, which is the same Priority Report that Defendant Abell stole the EasyMorph model of on April 22, 2024. The code Defendant Abell captured and sent in email is the code used to pull data for the report. By stealing this code, along with the EasyMorph model, Abell is able to copy Aspirion's reporting model and replicate at Ternium the same specific business reports.

74.     Given her long tenure and positions with the Company, Defendant Abell knew exactly which applications, processes, and codes were most valuable for manipulating and processing client data. This is reflected by the evidence demonstrating that Defendant Abell

targeted Aspirion's proprietary applications, processes, and codes related to the EasyMorph and Aspirion's Compass platforms, in addition to the Company's Priority Report.

75.     Upon information and belief, Defendant Abell was able to steal Plaintiffs' trade secrets and confidential information by working at Ternium while remaining employed by Aspirion. By stealing the "blueprints" of Aspirion data modeling, Defendant Abell provided Ternium with what they knew and understood well from their time at Aspirion.

76.     Upon information and belief, the actions of Defendant Abell enabled the Former Employee Co-Conspirators to effectively solicit and service Aspirion's clients and prospective clients.

**H.  The Former Employee Co-Conspirators Solicited Aspirion's Clients and Prospective Clients While Employed by Aspirion.**

77.     Upon information and belief, Defendant Abell's theft and misappropriation of Aspirion's trade secrets aided Former Employee Co-Conspirators in their scheme to effectively solicit and service Aspirion's current and prospective clients to benefit Ternium.

78.     Upon information and belief, the Former Employee Co-Conspirators used Aspirion's list of prospects in SalesForce to identify and pursue business on behalf of Ternium while still employed at Aspirion.

79.     Defendant Abell's actions aided the Former Employee Co-Conspirators' solicitation of the following Aspirion clients, including but not limited to, Advent Health, Archbold, Banner Health, Baptist Medical Center Jacksonville, Baylor Scott & White, Cedars Sinai, CHOC, Children's Medical Center Dallas, CHRISTUS, Centura, Community Medical Centers – Fresno, Cone, Corewell, Evangelical, Geisinger, Hackensack Meridian, JPS Health, Legacy, Methodist Dallas Medical Center, Ochsner, Optum, Orlando Health, Palomar, Parkview Health, Piedmont, Sarasota Memorial Hospital, Sharp Healthcare, Stanford, Texas Health

Resources, University of California – San Diego, University of Miami Health System, and Valleywise.

80.     Defendant Abell's actions also aided the Former Employee Co-Conspirators' solicitation of the following prospective Aspirion clients, including but not limited to, Louisiana Children's Medical Center, Houston Methodist, University of New Mexico Health System, Cottage Health, Kaiser, SSM Health, St. Luke's, UT Southwest, BJC Healthcare, and Mass General.

81.     Defendant Abell's ongoing misconduct poses a threat of further and irreparable harm to Aspirion in the form of lost client relationships, lost employees, lost goodwill, and the misuse of Aspirion's confidential and proprietary business information that Defendant Abell had access to during her employment, as described above.

82.     Aspirion has retained the undersigned attorneys to represent it in this action and has agreed to pay them a reasonable fee for their services.

## COUNT I
## VIOLATION OF DEFEND TRADE SECRETS ACT
## (18 U.S.C. §§ 1831-1839)

83.     Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-82 above as though fully set forth herein.

84.     The Defend Trade Secrets Act ("DTSA") provides a private civil action for the misappropriation of trade secrets that are related to product or services used in interstate commerce.

85.     The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" owned and kept secret by a company. 18 U.S.C. § 1839(3).

86.     Aspirion owns numerous trade secrets including, without limitation, its prospective client lists, pricing information, operational best practices, operations methodologies, customer-specific data, data translation models, data processing code, as well as other Confidential Information.

87.     Aspirion's trade secrets, including but not limited to Aspirion's client lists, prospective client lists, client pricing information, business and project forecasts, financial information, operational data, proprietary business files containing Aspirion-developed code, proprietary platforms, and all other confidential business information were at all times kept confidential by the Company.

88.     At all times material to this action, Aspirion is the "owner" of the Company's trade secrets, including competitively sensitive information about the Company's current clients, Aspirion's prospective client list, proprietary business files, and operational dataset.

89.     Aspirion's trade secrets provide independent economic value as the Company uses the Confidential Information, including data about existing Company clients and its prospective customer lists and related data compiled in its SalesForce database, operational data compiled in its Priority Report, and Aspirion-developed platform Compass and models for use in EasyMorph, to procure and maintain customers, through marketing strategies and competitive pricing.

90.     Aspirion's Confidential Information, including competitively sensitive information about its current clients and its prospective customer lists and related data compiled in its SalesForce database, historical operational data compiled in the Priority Report, and its proprietary platform and models, is not generally known and is not readily ascertainable by proper means.

91.     Defendant Abell was entrusted with this access to Aspirion's trade secrets and confidential business information during her employment at Aspirion. Specifically, Defendant Abell and the Former Employee Co-Conspirators, and through them, Ternium, had access to competitively sensitive data and intelligence on existing Company clients and the Company's prospective customer lists and related data compiled in its SalesForce database, which was a compilation of some of Aspirion's most confidential and competitively valuable information.

92.     The information compiled in Plaintiffs' SalesForce platform hosts the Company's list of prospective clients, notes about prospective clients, and any details concerning the status of any negotiations with prospective clients. This information is highly sensitive, confidential, and competitively valuable and includes financial and bidding information which is critical in the healthcare RCM industry.

93.     In addition to information on prospective clients, Aspirion also compiles and stores competitively sensitive information about its existing customers in SalesForce such as its client-specific Strategic Account Plans. Strategic Account Plans include customers' forecasted needs, Aspirion's perceived performance vulnerabilities, customers' contracts and pricing structure, customers' past and forecasted rates of utilization, and Aspirion's strategic opportunities for its customers. The SalesForce database also contains a client-specific "risk score" which reveals the perceived strengths and weaknesses of a client relationship. This information is highly sensitive, confidential, and competitively valuable.

94.     Upon information and belief, the confidential information at issue was misappropriated by Defendant Abell and the Former Employee Co-Conspirators when Defendant Abell accessed and used Aspirion's Strategic Account Plans, client risk scores, prospective client list, and other client-specific data compiled in Aspirion's SalesForce database to identify and

pursue Aspirion's existing and prospective clients for the benefit of Ternium and to siphon business away from Aspirion and to Ternium. This conduct is in direct breach of their ongoing duties to maintain the secrecy of and not use or disclose Aspirion's trade secrets and confidential business information.

95.     Beyond SalesForce, Defendant Abell also had access to and managerial responsibility over Aspirion's complete operational history for every high balance clinical denials client dating back 12 years. This file, referred to as the "Priority Report," is a large repository of historical operational data providing Plaintiffs' complete performance history on a client-by-client basis. It contains commercially valuable and competitively sensitive data, such as Aspirion's historical success rate, historical yield rate, historical collection rate, historical time to payment, and client history, among other data. The repository contains historical data on every discrete denial type (with categories and indicators), which is used frequently to produce internal reports containing trend analytics based on inventory history and outcomes.

96.     The information contained in Aspirion's Priority Report derives independent material economic benefit because competitors could use this information to identify and target Aspirion's most valuable clients based on their historical utilization rates, tailor pricing structures and other contract terms based on the benefit of Aspirion's existing practices, and therefore, unfairly and directly compete with Aspirion in contract negotiations or bid processes.

97.     Upon information and belief, the confidential information at issue was misappropriated by Defendant Abell and the Former Employee Co-Conspirators when Defendant Abell accessed and used the operational data in Aspirion's Priority Report to identify, pursue, and negotiate contracts with Aspirion's clients for the benefit of Ternium and to siphon business away from Aspirion and to Ternium. This conduct is in direct breach of their ongoing duties to maintain

the secrecy of and not use or disclose Aspirion's trade secrets and confidential business information.

98.     Defendant Abell stole Aspirion's raw client data files, standardized client data structures, and data translation models and methodology that are compiled in EasyMorph and the Company's Compass database.

99.     Given the confidential, raw client data and sensitive nature of the information, Plaintiffs restrict access to its EasyMorph models to specific individuals on the Aspirion Data Engineering team. Defendant Abell, as a Support Manager of the Aspirion Data Engineering team, was entrusted with access to the EasyMorph database and the EasyMorph models developed by Aspirion.

100.    Upon information and belief, the confidential information at issue was misappropriated by the Former Employee Co-Conspirators through the hiring of Defendant Abell to steal Aspirion's trade secrets including data, code, and other confidential information.

101.    The proprietary information stolen by Defendant Abell has economic value because it can be used to replicate the Aspirion systems and processes.

102.    As both a direct and proximate result of Defendant's misappropriation of Aspirion's trade secrets, Plaintiffs' business relationships with prospective clients continue to be damaged.

103.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendant Abell's misappropriation of Aspirion trade secrets due to the numerous business opportunities Ternium diverted and continues to divert from Aspirion.

104.    Plaintiffs have an inadequate, insufficient, and incomplete remedy at law absent injunctive relief enjoining Defendant from the misappropriation described herein.

105.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), Aspirion is entitled to recover damages for its actual losses, and to prevent Defendant Abell's unjust enrichment.

106.    Pursuant to 18 U.S.C. § 1836(b)(3)(A), Aspirion seeks preliminary and permanent injunctive relief to enjoin Defendant Abell from using and misappropriating Aspirion's Confidential Information including, but not limited to, the Company's prospective customer lists and related data.

WHEREFORE, Plaintiffs demand judgment against Defendant Abell for all damages under the law, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs, and for injunctive relief, the costs of bringing this action, and any other appropriate relief under § 542.335(1)(j), including Plaintiffs' attorneys' fees and costs incurred in bringing this action under § 542.335(1)(k).

## COUNT II
### VIOLATION OF FLORIDA UNIFORM TRADE SECRET ACT
#### (Fla. Stat. § 688.001 *et seq.*)

107.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-82 above as though fully set forth herein.

108.    The data compilations and records of Aspirion and the Confidential Information contained therein, and especially the lists of Aspirion's existing and prospective customers, lists of identified sales opportunities, the opportunity-specific data compiled in the Company's SalesForce database, Aspirion-developed code for denials reports, and EasyMorph models to standardize client data, are trade secrets owned by Aspirion and subject to protection under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq*. *See* Fla. Stat. § 688.002.

109.    This information derives independent economic value by not being accessible, through proper means, to competitors such as Ternium, which can profit from its use or disclosure.

24

This identifies Aspirion's existing and prospective clients and specific sales opportunities which are not readily available to the public or to the Company's competitors. The Company has dedicated and continues to dedicate significant investment (both time and money), research, business intellect, client relationships and data collection efforts to compile the extensive data on existing and prospective clients captured in the Company's SalesForce database. The information contained in Aspirion's SalesForce platform, compiled over the course of two decades, gives the Company a competitive advantage over its competitors.

110.    Likewise, the EasyMorph models and code used to transform client data and create denials reports reflect a significant amount of time and know-how invested by Aspirion. These data models derive independent economic value because Aspirion's proprietary data translation methodology was developed to efficiently standardize client files and data in a swift and digestible manner to most effectively perform denials work.

111.    Aspirion has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including restricting access to the SalesForce database to only key individuals in its workforce and requiring key employees with access to review and acknowledge Company Acceptable Use policies.

112.    On information and belief, Defendant Abell, together with the Former Employee Co-Conspirators, misappropriated and misused Aspirion's confidential, trade secret information in violation of the Florida Uniform Trade Secrets Act by using and/or disclosing Aspirion's existing and prospective customer information without the Company's consent and despite the fact that Defendant Abell and the Former Employee Co-Conspirators' knowledge of this information was obtained in the course of their employment with Aspirion, and thus under circumstances giving rise to a duty to maintain the information's secrecy and limit its use.

113.    Defendant Abell also misappropriated Aspirion's data processing methodologies and trade secret information in violation of the Florida Uniform Trade Secrets Act. The Former Employee Co-Conspirators recruited Defendant Abell to work at Ternium (while she was still employed by the Data Engineering team at Aspirion), and, upon information and belief, enlisted Defendant Abell to download code and proprietary models necessary to develop Aspirion's denials reports and standardized client data files to replicate Aspirion business systems and processes at Ternium.

114.    As both a direct and proximate result of Defendant's misappropriation of Aspirion's trade secrets, Plaintiffs' business relationships with prospective clients continue to be damaged.

115.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendant Abell's misappropriation of Aspirion trade secrets due to the numerous business opportunities Defendant Abell helped divert and continues to divert from Aspirion.

116.    Plaintiffs have an inadequate, insufficient, and incomplete remedy at law absent injunctive relief enjoining Defendant Abell from the misappropriation described herein.

WHEREFORE, Plaintiffs demand judgment against Defendant Abell for all damages under the law, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs, and for injunctive relief, the costs of bringing this action, and any other appropriate relief under § 542.335(1)(j), including Plaintiffs' attorneys' fees and costs incurred in bringing this action under § 542.335(1)(k).

## <u>COUNT III</u>
## BREACH OF DUTY OF LOYALTY

117.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-82 above as though fully set forth herein.

118.    Defendant Abell owed a duty of loyalty to her employer, Aspirion, under Florida law by virtue of her being an employee of Aspirion.

119.    Defendant Abell had a duty of loyalty to Aspirion, as her employer, not to engage in disloyal acts in anticipation of future competition with the Company.

120.    Defendant Abell breached her duty of loyalty by stealing and misusing Aspirion's Confidential Information acquired during the course of her employment for the benefit of Ternium.

121.    As both a direct and proximate result of Defendant Abell's and the Former Employee Co-Conspirators' misconduct, Plaintiffs have suffered and continue to suffer damages.

122.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendant Abell's and the Former Employee Co-Conspirators' breaches of their duty of loyalty not only by the loss of value of the diverted business, but also by the damage, which cannot be calculated, of lost relationships and goodwill enjoyed with the healthcare providers.

123.    Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Defendant Abell from the conduct described herein.

WHEREFORE, Plaintiffs demand judgment against Defendant Abell, for (1) preliminary and permanent injunctive relief; (2) all damages available under the law available against Defendant Abell, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs; and (3) such further relief as this Court deems just and proper.

## COUNT IV
## CIVIL CONSPIRACY

124.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-82 above as though fully set forth herein.

125.     This is a civil conspiracy claim against Defendant Abell having reached either an express or implied agreement with the Former Employee Co-Conspirators and Ternium to (1) conspire to create Ternium, (2) solicit employees away from the Company to join Ternium, (3) use Ternium to unlawfully steal the Company's existing and prospective clients and tortiously interfere with its business relationships and the substantial goodwill developed in connection with these relationships, and (4) steal and misuse Plaintiffs' confidential and proprietary business information that Defendant Abell possessed by virtue of her employment, in aid of Ternium's solicitation of Plaintiffs' existing and prospective clients and employees.

126.     On information and belief, Defendant Abell, the Former Employee Co-Conspirators, and Ternium reached either an express or implied agreement on or around August 4, 2022.

127.     As set forth herein, Defendant Abell conspired with the Former Employee Co-Conspirators (acting in concert) to such an extent that, but for their mutual agreement to take part in a conspiracy, it would have been impossible for them to divert clients and employees away from the Company and commence business relationships with Ternium.

128.     The underlying unlawful acts taken by Defendant Abell in connection with the Former Employee Co-Conspirators to conspire to create Ternium and solicit business, including (1) direct solicitation of Plaintiffs' employees and clientele through Ternium, (2) tortious interference of business relationships, and (3) misuse of Plaintiffs' confidential and proprietary business information for the purpose of recreating Aspirion's systems at Ternium, have damaged Aspirion.

129.     As both a direct and proximate result of Defendant Abell's conspiratorial misconduct, Plaintiffs have suffered and continue to suffer damages.

130.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendant Abell's conspiratorial misconduct not only by the loss of value of the diverted business, but also by the damage, which cannot be calculated, of lost relationships and loss of goodwill enjoyed with the healthcare providers.

131.    Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Defendant Abell from the conduct described herein.

WHEREFORE, Plaintiffs demand judgment against Defendant Abell for (1) preliminary and permanent injunctive relief; (2) all damages available under the law against Defendant Abell, including both the actual loss and unjust enrichment caused by their conspiracy, disgorgement of profits earned by them, imposition of a constructive trust on all proceeds received by them at the expense of Plaintiffs, and prejudgment interest; and (3) such further relief as this Court deems just and proper.

Dated: December 23, 2024              Respectfully submitted,

                                      /s/ Jorge D. Guttman
                                      Jorge D. Guttman
                                      Florida Bar No. 15319
                                      Becky N. Saka
                                      Florida Bar No. 1010315
                                      Nicolaos Soulellis
                                      Florida Bar No. 1031737
                                      **GUNSTER**
                                      600 Brickell Avenue
                                      Brickell World Plaza
                                      Miami, Florida 33131
                                      jguttman@gunster.com
                                      bsaka@gunster.com
                                      nsoulellis@gunster.com

                                      and

                                      Robert B. Gilmore*
                                      Kevin L. Attridge*
                                      Samantha P. Christensen*

Jacqueline C. Lau*
**STEIN MITCHELL BEATO & MISSNER LLP**
2000 K Street NW, Suite 600
Washington, DC 20005
Tel: 202-737-7000
RGilmore@steinmitchell.com
KAttridge@steinmitchell.com
SChristensen@steinmitchell.com
JLau@steinmitchell.com

*Counsel for Plaintiffs*

\* motion for *pro hac vice* forthcoming

ACTIVE:35403552.1

152.